IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff<br><br>-vs-<br><br>GERALD ATKINSON<br><br>Defendant | CASE NO.  04 CR 478<br><br>ORDER ON DEFENDANT'S MOTION FOR A NEW TRIAL |

UNITED STATES DISTRICT JUDGE LESLEY WELLS

Gerald Atkinson asks for a new trial, arguing prosecutorial misconduct and the exclusion by the Court of evidence of after-hours employee sexual activities by government witness Terrell Perkins.

Rule 33 provides that a court may, upon the defendant's motion "vacate any judgment and grant a new trial if the interests of justice so require."  Fed. R. Crim. P. 33(a).  Upon review of the trial transcript and for the reasons set forth below, Mr. Atkinson's motion will be denied.

Trial in this case began 27 December 2005.  After eight days of testimony by eleven government witnesses, the defendant, and fifteen defense witnesses, the jury deliberated, under oral and written jury instructions, and on 12 January 2006, returned

guilty verdicts on all four counts:  conspiracy to defraud the United States, two counts of major fraud against the United States, and false statements to the government.

At its core, this case involves Gerald Atkinson's certifications, as a Quality Control Manager for Electrolizing Corporation of Ohio ("Electrolizing"), that certain parts – for use in the nuclear reactor compartments of United States Navy Virginia Class Nuclear Submarine Fleet, the "new attack submarine class," – were nickel-plated in conformance with military specifications and that required tests had been properly and successfully performed. (Tr. 1 at 53).

United States Navy Captain Richard Breckenridge testified that in these Virginia Class nuclear submarines: "everything hinges on the nuclear reactor.  There is only one of them, and so there is . . . no backup there.  Basically, the nuclear reactor produces the heat we use to generate steam to turbines both for propulsion as well as making electricity and other things, including the water we drink.  The reactor produces the heat that makes the steam that cleans the water from salt water to drinking water, so it is our principal and primary source of power." (Tr. 1 at 49-50).   "Because it is in a 'shielded' compartment, the Virginia Class [reactor] . . . is going to operate for thirty-three years without maintenance."  (Tr. 1 at 53).  "To pull one of them out of operation for any period of time that is not a planned maintenance availability takes that front line war ship out of service for the defense of the country, and with the number of missions we have right now and the number of places our submarines are operating, that is much more significant than the cost of the six to nine to twelve month repair period." (Tr. 1 at 54).

As to the stringent fabrication process requirements and Navy reliance upon the certifications of plating and testing conformance with military specifications, Captain Breckenridge testified: "I don't want to exaggerate, but the life of my crew rests upon that certification process. You know, operating a submarine is a dangerous business. . . .We can operate that ship in harm's way. . .and put our lives on the line with that equipment." (Tr. 1 at 64).

Joseph Maletta, administrator of the contract between the Government and the prime contractor, Bechtel Plant Machinery ("Bechtel"), testified that the control drive mechanism is a critical component of the nuclear reactor on Naval submarines and that "in the case of the control drive, Marine Mechanical is the only qualified source of supply for control drive mechanisms that the United States has. . . .Electrolizing Corporation is what we in the Government refer to as a subtier contractor. It is a contractor one level below our subcontractors. They are used for nickel plating of various parts that go into the control drive mechanism." (1 TR at 81).

Military contract specifications required that "coupons," (thin pieces of metal made from the same material as the component part being plated), be subjected to a "bend test". The bend test required Electrolizing to bend a coupon 180 degrees <u>after</u> plating and then visually inspect the coupon for flaking or other adhesion problems. Mr. Atkinson, as Quality Control Manager, was responsible for certifying the proper material and testing.

The government elicited evidence that pre-bending of coupons <u>before</u> plating, so as to avoid the required tests, occurred during Mr. Atkinson's tenure as Electrolizing's

-3-

certifying Quality Control Manager. Evidence was presented that the pre-bending was prompted because Electrolizing "could not get adhesion on the inconel coupons, so basically, we had to bend the part, the coupon, prior to plating, and basically sold it off as , you know, we did it after." "We could not get the nickel to stick to the point where you could bend the coupon at this 90 degree angle and which it absolutely [would] stay on perfectly. It did adhere, it didn't just fly off in a breeze, but to the specifications, it wasn't adhering well enough." (Tr. Vol. 4, p. 690-691, lines 20-23, 1-5).

## A.  Employee Drug Use and After-Hours On-site Sexual Activity

Prior to opening statements, this Court denied the government's motion in limine to preclude evidence of employees Robert Buerger's and Terrell Perkin's on-the job drug use but granted the government's motion in limine to exclude after-hours on-site sexual activity by Terrell Perkins. (ECF 55).

Mr. Atkinson claims a new trial is warranted for the reason that the excluded evidence regarding Mr. Perkins' after-hours and weekend sexual activity was relevant and should have been admitted. (ECF 83 at 13).

The criminal conduct changed in this case occurred during business hours. So did Mr. Perkins' and Mr. Buerger's marijuana use. Evidence of this was relevant and not unduly prejudicial. In contrast, to the limited extent that evidence of Mr. Perkins' after-hours sexual activities in a company building might be conceived to have some limited relevance, any such relevance was substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury. (Fed. R. Evid. 403).

-4-

**B.     Conduct of the Prosecutor**

Mr. Atkinson contends he is entitled to a new trial because AUSA Richard Blake "committed prosecutorial misconduct sufficient to warrant reversal under a plain error analysis" when, in closing remarks to the jury:  (1) he referenced evidence admitted at trial of Mr. Atkinson's indirect death threat on the life of whistle blower Terrell Perkins; (2) the government never disclosed Mr. Buerger's "statement" to Mr. Atkinson and failed to make a timely disclosure of exculpatory evidence, and (3) he blamed Mr. Atkinson for the timing of the trial during the holiday season.  (ECF 83 at 6-12).  At trial, Defense counsel did not object to these closing statements by the AUSA.

In United States v. Carroll, the Sixth Circuit Court of Appeals clarified its "doctrine on prosecutorial misconduct in closing argument."  26 F.3d 1380, 1381-82 (6th Cir. 1994). In so doing, the Court adopted in part the tests it had previously set forth in United States v. Leon, 534 F.2d 667, 678-83 (6th Cir. 1976) and United States v. Bess, 593 F.2d 749, 753-57 (6th Cir. 1997), but rejected the approach it had taken in United States v. Thomas, 728 F.2d 313, 319-20 (6th Cir. 1984).  Carroll, 26 F.3d at 1383-87.  The Carroll Court mandates application of the Bess test in all cases "involving non-flagrant improper prosecutorial remarks."  Carroll, 26 F.3d at 1387.

Under the Bess test, the Court should first determine whether the prosecutor's remarks are "improper."  Carroll, 26 F.3d at 1384.  If the statement is "improper," the Court must determine "whether the error was harmless."  Id.  Under Bess, non-flagrant prosecutorial error is harmless, and a new trial "is inappropriate if either proof of defendant's guilt is overwhelming, or defense counsel failed to object to the error, or if

-5-

the trial court cured the error with an admonishment to the jury." Id. at 1385, n.6 (emphasis in original). To determine whether prosecutorial error in closing argument is flagrant, courts must consider the following four Leon factors:

    (1)    whether the remarks tended to mislead the jury or to prejudice the accused;

    (2)    whether [the remarks] were isolated or extensive;

    (3)    whether they were deliberately or accidentally placed before the jury; and

    (4)    the strength of the evidence against the accused.

Carroll, 26 F.3d at 1384-85 (citing Leon, 534 F.2d at 679).

### 1. Threat Evidence[1]

AUSA Blake, in rebuttal argument, told the jurors: "It is up to you to determine it. But would – when a man is asked and is told by his friend I'm going to go into the

---

[1] Mr. Buerger's testimony at trial:

> Q. And did you say anything to Mr. Atkinson about your involvement in this case?
>
> A. Yes. We all knew it was going down. Basically, I figured – I had already talked to the investigators at this time, but not the prosecution, so Jerry knew that I was going to talk – on my way to talk to the prosecutors, and basically Jerry was asking me what are you going to do, and I says, you know, I'm going to tell the truth. I figured I owed it to Jerry, because of our friendship.
>
> Q. And did he say anything to you?
>
> A. Well, he wasn't upset with me that he showed, but he was very upset at the situation. He was actually so upset that he said that if he does time over this, he would have Terrell Perkins killed.
>
> Q. Did you take him seriously, Mr. Buerger?
>
> A. He was angry. It is hard to say when you're upset like that, but I got to admit, every time I leave the house, I have to look around the corner.

(Trial Transcript, Vol. 5 at 753-754).

government and tell them what is going on, and he doesn't say anything other than if I do jail time, I'm going to retaliate against Terrell, are those the words of a man who is not guilty of the charges here? And again, that is your call to make on credibility." (Excerpt Trial Transcript, Government's Closing Arguments at 126).

Considering the factors set out by the Sixth Circuit in U.S. v. Leon, in the context of all the evidence, the remarks did not tend to mislead the jury or to prejudice the accused. The prosecutor's remarks were isolated and brief, and did not reiterate the threat but referenced retaliation. Although not accidentally elicited, testimony of Atkinson's alleged threat against Perkins was challenged by contradictory testimony the jury heard from defendant himself and from another person present at the time the remarks were said to have been made.

The prosecutor's remarks were not flagrant. U.S. v. Carroll, 26 F3d 1380, 1381-82 (6th Cir. 1994) and U.S. v. Bess, 593 F2d 749, 753-57 (6th Cir. 1997). Nor could these statements have affected the outcome of this trial. The jury had abundant documentary and physical evidence before it that Mr. Atkinson submitted false certifications to the government, i.e. Government Exhibits 11C-11H, 13B, 13D, 17, 18, and 44. The jury heard testimony from four witnesses that the defendant had actual knowledge of the pre-bending occurring in Plant 2 and, hence, of the falsity of certifications he made and submitted to the government. Given the strength of the evidence against Mr. Atkinson, a new trial due to this "retaliation" comment of AUSA Blake during closing argument is not warranted.

Further, the evidence of Mr. Atkinson's alleged threat was not elicited by the prosecutor alone. Defendant's counsel elicited further testimony on the "threat" issue

on cross-examination of Mr. Buerger as well as during direct examination of Messrs. Atkinson and Rowland. Defendant's counsel also referenced the "threat" evidence in his own closing argument, and suggested that Mr. Buerger was lying about the threat because the evidence was that John Rowland did not overhear Mr. Atkinson's alleged statement. (Unofficial Trial Transcript for 11 January 2006, at 92). Under these circumstances, the prosecutor's reference to the threat evidence was not improper – let along flagrant error. E.g., Carter, 236 F.3d at 783 (noting that the courts should "consider whether, and to what extent the prosecutor's . . . remarks were invited by defense counsel's argument").

### 2. The Government's Disclosure Obligations

Mr. Atkinson asserts he is entitled to a new trial because: (1) the government elicited testimony from witness Robert Buerger "that was unsubstantiated, inflammatory and blatantly prejudicial" that Gerald Atkinson made in Buerger's presence, a threat on the life of government witness Terrell Perkins, but that the government never disclosed to Mr. Atkinson Mr. Buerger's "statement" that Mr. Atkinson threatened the life of Terrell Perkins; and (2) the government failed to make a timely disclosure of exculpatory evidence. (ECF 83, 3-6, 12-13).

The defendant insinuates, but does not show, a Jencks violation on page 3 of his Motion for a New Trial. During trial, Mr. Atkinson did not raise a Jencks Act claim. The Jencks Act, 18 U.S.C. § 3500, requires the government to provide the defense "with any material statement made by a witness to the government that is signed or otherwise verified by the declarant." United States v. Davis, 306 F.3d 398, 421 (6th Cir. 2002).

However, the government need not produce Jencks Act material until the witness "has testified on direct examination in the trial of the case." 18 U.S.C. 3500(a); see also United States v. Presser, 844 F.2d 1275, 1283 (6th Cir. 1988).  While the government has the option to produce Jencks Act material earlier than provided by the Jencks Act, it may not be compelled to do so. United States v. Algie, 667 F.2d 569, 572 (6th Cir. 1980).

As to Mr. Buerger's threat testimony, the prosecutor represented to this Court during trial that he provided defense counsel with the Grand Jury testimony and every note regarding Mr. Buerger before the indictment was even handed down.  (Trial Transcript, Volume 5, at 754-55; id. at Volume 7, at 1101 & 1104-08; see also ECF 93, at 2-3).  During trial, Mr. Atkinson's counsel did not directly dispute Mr. Blake's representation that all materials related to Mr. Buerger had been produced, nor did he make a motion to the Court for production of additional statements of Mr. Buerger, pursuant to The Jencks Act.[2]

Brady never has been read to create a constitutional right in the accused to unlimited discovery. United States v. Minsky, 963 F.2d 870, 874-75 (6th Cir. 1992).

---

[2] 18 U.S.C. 3500(b):
    (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §3500(b).

"The prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial."[3]  United States v. Presser, 844 F.2d 1275, 1281 (6th Cir. 1988).

The defendant acknowledges "the Government provided Mr. Atkinson with both the names and addresses of these employees before the date of trial" and "the accompanying grand jury testimonies and witness interviews by the eighth day of trial, during Mr. Atkinson's case-in-chief."  (Doc. 83 at 12).  That complies with Brady v. Maryland, 373 U.S. 83 (1963).

### 3. The Timing of the Trial

AUSA Blake remarked in closing, "Most people here don't relish being in this courtroom two days after Christmas, over the New Year's holiday.  It is this man who put us here.  Gerald Atkinson's actions put us all here, ladies and gentlemen.  And that is the focus of this trial and we have maintained that as the focus of this trial."  (Excerpt Trial Transcript, Government's Closing Arguments, at 36).

Defendant fully participated in the scheduling of this trial.  This case was originally set for trial on 27 December 2004.  (ECF 10).  At the defendant's initial request, and over the government's objections to defendant's second and third requests for continuances (ECF 20, 28), the trial was continued (ECF 15, 17, 24, 30).  On 15 November 2005, the day trial was finally to commence, the parties met in this Court's

---

[3]"Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.'"  Id. (quoting Pennsylvania v. Ritchie, 480 U.S. 39 (1987)).

chambers and agreed to continue the trial until 27 December 2005.  (ECF 34).  The government filed a stipulation setting forth the parties' agreement to continue the trial.  (ECF 35).

The statement objected to by Mr. Atkinson in this motion for a new trial occurred in the first moments of the prosecutor's rebuttal argument.  Defense counsel himself had referred to the timing of the trial in his opening statement: "I also want to begin by thanking you on behalf of Gerald Atkinson.  No matter what you decide in this case, you are taking time away from your lives at a very important time of the year, and we certainly appreciate it."  (Tr. 1 at 20-21).

All things considered,  the AUSA's remarks for which Mr. Atkinson seeks a new trial, were harmless.

Finally, during a jury instruction conference, the Court put forward a limiting instruction to submit to the jury.  (Court Ex. 1).  Defense counsel objected, not to the wording, but to giving any limiting instruction.  At defendant's request, the instruction was redacted from the jury instructions.[4]

---

[4]**CURATIVE INSTRUCTION**
YOU HAVE HEARD TESTIMONY FROM MR. BUERGER THAT GERALD ATKINSON USED MARIJUANA AND TOLD MR. BUERGER HE WOULD HAVE TERRELL PERKINS KILLED IF MR. ATKINSON SERVES JAIL TIME.
   WHETHER OR NOT YOU FIND MR. BUERGER'S TESTIMONY BELIEVABLE, YOU MAY CONSIDER HIS STATEMENTS ONLY TO DETERMINE WHETHER MR. ATKINSON COMMITTED THE CRIMES CHARGED IN THE INDICTMENT – NOT FOR ANY OTHER PURPOSE.  MR. ATKINSON IS NOT ON TRIAL FOR USING MARIJUANA OR FOR MAKING A STATEMENT WITH REGARD TO TERRELL PERKINS.
    FINALLY, YOU MAY NOT CONSIDER ROBERT BUERGER'S TESTIMONY THAT HE IS CONCERNED FOR HIS OWN SAFETY FOR ANY PURPOSE.  SUCH TESTIMONY HAS NO RELEVANCE TO THE ISSUES OF WHETHER THE GOVERNMENT CAN PROVE GERALD ATKINSON GUILTY OF THE CRIMES CHARGED BEYOND A REASONABLE DOUBT.

(Unofficial Trial Transcript, 11 January 2006).

**CONCLUSION**

For the reasons set forth above, Mr. Atkinson's motion for new trial (ECF 83) is denied.

IT IS SO ORDERED.


Dated: <u>13 February 2007</u>          <u>/s/Lesley Wells          </u>
                                        UNITED STATES DISTRICT JUDGE